**Mario MARTINEZ, Plaintiff,**

v.

**BRINKS, INCORPORATED,
Defendant.**

**No. 01–8393 CIV.**

United States District Court,
S.D. Florida.

Aug. 9, 2004.

Joel Stephen Perwin, Esq., Miami, FL, Pamela Beckham, Esq., North Miami Beach, FL, Daren Alan Stabinski, Esq., Miami, FL, for Plaintiffs.

Elliot H. Scherker, Esq., Miami, FL, Gregor Morris Gaebe, Esq., Coral Gables, FL, Donald W. Hardeman, Jr., Esq., Miami, FL, for Defendants.

***ORDER ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, MOTION FOR REMITTITUR AND ON DEFENDANT'S SUPPLEMENTAL MOTION FOR NEW TRIAL***

BROWN, United States Magistrate Judge.

**This matter** is before this Court on Defendant's Motion for Judgment as a

Matter of Law, Motion for New Trial, Motion for Remittitur, filed October 20, 2003, and on Defendant's Supplemental Motion for New Trial, filed March 30, 2004. The Court has considered the Motions, the Responses, the Replies, and all pertinent materials in the file.

### I. Motion for Judgment as a Matter of Law

 Defendant initially argues that there was no legally sufficient evidentiary basis for a reasonable jury to have found that Plaintiff satisfied his burden of proof on the following three elements of malicious prosecution: (i) initiation/causation; (ii) absence of probable cause; and (iii) malice.[1] The Eleventh Circuit has stated that

> a mere scintilla of evidence does not create a jury question. Motions for [judgment as a matter of law and for judgment notwithstanding the verdict] need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather,

---

1. The six elements of a malicious prosecution claim are:

(1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued;

(2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding;

(3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff;

(4) there was an absence of probable cause for the original proceeding;

(5) there was malice on the part of the present defendant; and

(6) the plaintiff suffered damage as a result of the original proceeding.
Alamo Rent–A–Car v. Mancusi, 632 So.2d 1352, 1355 (Fla.1994).

2. Plaintiff initially maintains that "[t]he Eleventh Circuit Court has already held that there

there must be a substantial conflict in evidence to support a jury question.
*Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir.2002).

### 1. Causation[2]

 A defendant is not considered to have instigated a criminal proceeding "if the defendant merely gives a statement to the proper authorities, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer or if the officer makes an independent investigation." *McCraney v. Barberi*, 677 So.2d 355, 356 (Fla. 1st DCA 1996). "However, if the defendant's persuasion is the determining factor in inducing the officer's decision . . ., then the defendant may be held liable." *Id.* In order to avoid liability, the defendant must have made "a full, complete, and accurate disclosure . . . to a public officer, so that the decision to prosecute is left entirely to his discretion." *Harris v. Lewis State Bank*, 482 So.2d 1378, 1382 n. 9 (Fla. 1st DCA 1986).

As evidence of causation, Plaintiff points to numerous portions of the trial testimo-

is sufficient evidence on causation in this case." That is not accurate, however, in that the Circuit Court merely found that summary judgment in favor of defendant was inappropriate based on the fact that a determination regarding the officer's decision to prosecute Plaintiff involved issues of credibility and weighing of the evidence, which were not appropriate "on the current . . . summary judgment record." *Martinez v. Brink's Inc.*, 2002 WL 31174153, slip op. at 6 (11th Cir. Sept. 18, 2002). Moreover, the deposition of Nick Porter was considered in the summary judgment motion in its entirety, whereas half of that deposition was not admitted at trial, the officers involved testified at trial, and on the summary judgment motion, as opposed to the trial, the Court was required to view all of the evidence in favor of Plaintiff, the non-moving party. Contrary to Plaintiff's statement, the Circuit Court did not make any finding as to the ultimate issue of causation which would bind this Court in its consideration of the instant motions.

ny, but claims that the "most important evidence" is that the tapes which were shown to the police by Brinks employees, particularly Dennis Romano ("Romano"), were not in full-motion video, but were in time-lapse, requiring the police to rely on Brinks employees to explain and interpret what was going on in the video. Palm Beach Sheriff's Office Detective James Murphy did state that a Brinks representative told him that there was a new employee and she was provided with a manifest by Plaintiff, and he was looking for that point in the tape. T. 5: 65.[3] Additionally, a Brinks representative identified Plaintiff's "coal sack" (a bag messengers used to keep paperwork [4]) for him on the video. T. 5:89. However, Det. Murphy testified that he reviewed several hours of tape before arriving at the point on the tape where Plaintiff could be seen placing the missing bag of money on the counter. T. 5:76.

He further testified that when he watched the security tapes, he could see Plaintiff bending down after he had placed the bag of money on the counter, and then his coal sack got bigger. T. 5:12. The tape then showed Plaintiff rolling the coal sack out to the truck on the cart, and there was a bulge in the bag. T. 5: 14. He and Det. Reid reviewed the tape several times and "made absolutely positively sure we both were seeing the same thing." T. 5: 14. Det. Murphy testified that they pointed out the crime to the Brinks employees, rather than vice versa, and the Brinks employees responded "how did we miss that?" T. 5:14.

Det. Murphy described the tape as "overwhelmingly compelling," and as providing probable cause to believe that Plain-

tiff committed the theft. T. 5:15, 23. He further testified that no one from Brinks ever tried to influence him, and they left the decision to arrest and charge Plaintiff entirely up to his judgment. T. 5:24–25. Similarly, Det. Reid testified that after he viewed the video, he had no doubt in his mind that Plaintiff had taken the bag, and this was not influenced by anyone else. T. 5:175–76.

The only "assistance" offered by Branch manager Jose Guilherme ("Guilherme"), was his advising them:

I see the bag, and then I don't see the bag. I told them that the coal sack looked empty and now it looked full, and that was about it.

*Id.* at 252.

Plaintiff relies on the testimony of former employee Nick Porter ("Porter"), who testified that Romano pointed out to the detectives as they were reviewing the tapes that he could see that "[Plaintiff] was checking in the pieces, and it was pinpointed that during the laps [sic], because the tap[e] lapsed, it was pointed out that [Plaintiff] had put a piece up on the counter and took it off and put it under the counter, and the vault person signed for it." (T. 1:155). However, Porter admitted that Romano

did not go and say, I see Martinez taking it. He said, there it is, it's disappeared, rewind it.

*Id.* at 155–56, 163. Porter stated that the detectives were the ones who asked who the messenger on the truck was. *Id.* at 157. Even Porter's testimony does not counter that of Romano, who stated that he did not urge the detectives to arrest anyone. T. 5:131.[5] Moreover, although

---

3. The Court notes that there are two volumes of the transcript labeled "Volume 4"—one dated September 28, 2003 and one dated September 30, 2003. The Court will refer to the September 28, 2003 transcript as "4" and the September 30 transcript as "5."

4. Also referred to in the record as a cold sack.

5. Romano testified that he did not actually see Plaintiff put the bag up and take it back, or put anything in the coal sack (T. 5:158) and that he initially told the detectives that he had

Porter's testimony suggested that the detectives were "directed" to make a certain finding, even he agreed that everyone in the room, including the detectives, "got to conclude independently what those tapes or what those frozen frame snapshots were showing." *Id.* at. 169–70.

With respect to Plaintiff's argument that Brinks did not provide the detectives with certain information, it is only where "pertinent information is withheld, or the facts are misrepresented," that it can be said that the reporting party has undermined the intelligent exercise of the officer's discretion. *Harris v. Lewis State Bank,* 482 So.2d 1378, 1381 n. 9 (Fla. 1st DCA 1986). Plaintiff's argument that Brink's employees acted wrongfully by influencing the detectives not to watch the portions of the tape that did not show Plaintiff, including the tapes from the cameras in the vault, is illogical, if, as Det. Murphy testified, the portion of the tape that he saw was "obviously compelling." The same applies to the Miami tapes.[6]

Brinks did tell Det. Murphy that Ms. Hernandez's job was to "check[ ] the money in" but he did not recall being told that she was supposed to take the bag and throw it into a bin or hand it to somebody to put in a bin (T. 5:87). However, in light of Det. Murphy's certainty regarding what the tape showed, including that Plaintiff's coal sack had increased in size, the Court finds that the "withholding" of this information is not significant.

The Court finds that there was insufficient evidence for the jury to have found that Brinks' "persuasion [was] the determining factor in inducing the officer's decision." Accordingly, Brinks is entitled to judgment notwithstanding the verdict on this ground.

## 2. Absence of Probable Cause

■ Because the Court finds, as a matter of law, that Defendant did not instigate the criminal proceeding against Plaintiff, the Court need not reach the issue of probable cause. However, even assuming that there was sufficient evidence for the jury to find that Brinks had instigated the prosecution, the Court finds that there was probable cause to support it.

The burden of proving lack of probable cause for a prosecution has been described as an "onerous requirement" as to which the plaintiff bears a "heavy burden of proof." *Burns v. GCC Beverages, Inc.,* 502 So.2d 1217, 1219 (Fla.1986). In addition to viewing the tape, which Det. Murphy found to be "compelling" evidence, Det. Murphy had also been advised that Plaintiff had violated a number of company procedures that day. The driver who rode with Plaintiff had stated that he and Plaintiff exited the truck and went for a 15 minute coffee break at the Fort Drum Plaza, after the stop at the West Palm Beach location, and there were a few minutes where he and Plaintiff were separat-

---

reviewed the tapes and not found anything. T. 5:127. He further stated that after about an hour of Guilherme running the tape machine and pushing the buttons back and forth at the direction of Det. Murphy, Det. Murphy said "stop it here. I think I see something." T. 5:127–28. At that point they all looked at the tape extra hard and could see "the bag— the door close and then the bag disappears toward Mr. Martinez." T. 5:128. Romano explained that he had not seen it when he had initially looked at the tapes because it was such a quick instant. T. 5:128.

6. Romano testified that he watched the Miami tapes, which showed Plaintiff checking out all of the First Union pieces. T. 5:123. Det. Murphy stated that he did not review the Miami tapes because Porter had said that he had reviewed them and there was nothing on them, and also, because he had already seen, using both of the original videos, the crime being committed. T.5:104. Finally, Plaintiff himself testified that he left Miami with all of the First Union bags, including the $350,000. T. 4:24.

ed. T. 5:19–21, 81.[7] Furthermore, Plaintiff provided an incorrect number as his cell phone number to Romano. T. 5: 119.[8]

This Court finds significant the fact that the prosecutor in Plaintiff's criminal case, Assistant State Attorney Lanna Belohlavek, independently found that probable cause existed to prosecute Plaintiff for the theft. T. 3:73–75. Ms. Belohlavek stated that she reviewed the police reports, the statements provided by Brinks, and the videotapes, and independently determined several months prior to Plaintiff's trial that there was sufficient evidence for a jury to find that Plaintiff had committed the theft. T. 3:81–82, 108, 130–33. Ms. Belohlavek further testified that no one from Brinks ever attempted to influence her decision to prosecute the case in any way. T.3:78.

Therefore, the Court finds, based on the totality of the evidence presented at trial, that there was insufficient evidence for the jury to find that no probable cause existed for the criminal proceeding against Plaintiff, and that Defendant Brinks is therefore entitled to judgment notwithstanding the verdict on this ground.

### 3. Malice

■ The jury was instructed that "[o]ne acts maliciously in instituting a criminal proceeding against another if he does so for the primary purpose of injuring the other, or recklessly and without regard for whether the proceeding is justified, or for any primary purpose except to bring an offender to justice." Plaintiff raises several theories which he maintains constitute evidence of malice.

First, Plaintiff relies on Porter's testimony that Romano told him as they were reviewing the tapes that "this was going to be a West Palm loss." T. 1:156.[9] Plaintiff argues that this is evidence that Brinks intended to falsely characterize the loss by wrongfully naming Plaintiff as the perpetrator. The Court rejects this argument on several grounds.

As explained in the preceding section, the Court finds that the evidence proved that probable cause existed to prosecute Plaintiff for the theft. Secondly, even if Romano did make this statement to Porter regarding a "West Palm loss," there was no evidence that the loss occurred anywhere *other* than West Palm Beach, which might suggest a nefarious motive on the part of Romano. Plaintiff himself testified that he picked up the money from Miami and left with it. Nor was there any credible evidence that there was any financial incentive to Brinks to make the loss appear to have occurred in West Palm Beach even if it actually hadn't. Romano denied being under pressure from supervisors as to where losses were declared to have occurred regarding Miami versus Palm Beach, and stated that there was no insurance benefit either way. T. 5:140–41. Porter merely testified:

> Well, I'm *assuming* that's why. It's spec—I know definitely that Miami had a lot of losses. I know definitely that Angel and Dennis were under a lot of pressure to make sure the losses did not occur. I know that because both of these—those individuals have told me that in the past. (emphasis added).

7. Although Plaintiff denied this to Det. Murphy, he admitted in cross-examination that he had not been 100% truthful, and also admitted that he violated company policy when he used the company cell phone and his personal cell phone on the job. T. 4: 15, 20, 21, 41.

8. Plaintiff points to evidence which implies that Brinks "curried favor" with the detec-

tives by purchasing their lunch, the cost of which was approximately $17.00. The court finds that this does not even rise to the level of a "scintilla" of evidence in Plaintiff's favor.

9. Romano denied making this statement. T. 5:138.

*Id.* at 158. Significantly, Porter initially testified that Romano did not say anything to him about such a concern with respect to this particular loss. *Id.* at 162–63.

With respect to any malice on the part of Brinks toward Plaintiff personally, there was absolutely no evidence of same. In fact, Romano testified that he was not even aware of Plaintiff until this event. T. 5:143. Both detectives testified that at no time did any employee of Brinks display any malice or show any intent to cause harm in any way to Plaintiff. T. 5:24, 176.

Plaintiff argues that because Brinks employees did not believe that the tape showed probable cause for the arrest, malice must be inferred. However, "[t]he inference of malice from the absence of probable cause is not one of law but merely a presumption of fact which may be rebutted. This is an inference which the jury is not required to draw, and which it should not draw if other facts disclosed by the evidence lead to a different conclusion." *Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181, 1185 (Fla.1977). In this case, there was evidence that the detectives told Brinks employees that the tape indicated that probable cause existed, despite the employees' personal beliefs (and

the Court has found that it did exist), which counteracts any inference of malice as to Brinks.[10]

Plaintiff also relies on the testimony of Jose Guilherme at Plaintiff's bond hearing as evidence of malice. As further discussed *infra* (Section II, 5.) this evidence is irrelevant in that the Court finds that Plaintiff was not pursuing a continuation theory at trial, but rather was only claiming that Brinks wrongfully instigated the criminal proceeding. To the extent that the testimony can be read to indicate a preexisting state of mind of malice on the part of Guilherme, the Court finds that such evidence is insufficient to create an inference of malice.[11]

The Court further finds no evidence of malice in Romano's actions. He testified that although he initially saw nothing on the West Palm tapes, (T. 5:125), he decided to call the Palm Beach Sheriff's Office because he believed that the loss didn't happen in Miami based on what he had seen on the Miami tapes, and Plaintiff himself had stated that he had gotten everything on the truck and up to Palm Beach. T. 5:125.[12]

The Court finds that there was insufficient evidence for the jury to have found malice on the part of Brinks[13], and there-

10. Although Romano testified that based on his prior law enforcement background, he believed that the tape alone did not provide probable cause for the arrest, he did say that he could see the bag on the window when the door closed, and as it closed, the bag disappeared and he could see it moving backwards, and that Plaintiff's coal sack was full when he put it in the back of the truck. T. 5:159–60. It was this same scenario that the detectives and the prosecutor believed constituted probable cause.

11. At the bond hearing, Guilherme agreed that the theft was "captured on video" and that it was "apparent" that Plaintiff was responsible for the missing money. T. 2:36. This contrasts with his deposition testimony,

in which he stated that when he reviewed the tape, he saw nothing unusual. However, Guilherme stated that his "suspicion" came from "what the police department said."

12. Plaintiff also attempted to prove that Romano actually contacted the Sheriff's Department on the 11th, rather than the 12th, based on a charge on Romano's expense sheet which is dated 12/11. Again, this Court finds that this evidence does not rise to the level of a "scintilla."

13. Even if the detectives wrongfully concluded that there was probable cause in the absence of same, that does not create or infer malice on the part of Defendant.

fore Defendant is entitled to judgment notwithstanding the verdict on this ground.

## II. *Motion for New Trial*

### 1. Violation of Order in Limine

Plaintiff's counsel violated the Court's Order in Limine when he made the following statement during closing argument:

> He was—I don't know if you remember from the deposition, but [Nick Porter] was fired before and he was rehired by Brink's. And what is this about conduct unbecoming? What does that mean, that he doesn't go along with the plan?

R. 5:87.[14] Upon Defendant's Motion, the Court reserved ruling on a mistrial, but did give a curative instruction to the jury.[15]

The Court again rejects Plaintiff's argument that Defendant improperly opened the door to this comment. Although in closing argument, defense counsel did refer to Porter's termination being for conducting unbecoming, there was evidence to that effect (Porter's deposition) and there was no order in limine as to this evidence. The Court finds, however, that the curative instruction sufficiently advised the jury and therefore remedied any possible prejudice to the Defendant.

### 2. Improper Appeals to Emotion and Prejudice

■ Defendant argues that counsel improperly introduced purely emotional elements into the jury's deliberations when he told the jury that he was "inexperienced" and that this was the biggest case he had ever tried and was nervous about it. Not only did Defendant did not object to these statements at the time they were made, but defense counsel made a similar comment in his closing argument. Because the error was not objected to, the Court must determine whether fundamental or plain error occurred. *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179, *reh. denied*, 52 Fed.Appx. 495, 2002 WL 31557358 (11th Cir.2002). The Eleventh Circuit has stated that "a finding of plain error 'is seldom justified in reviewing argument of counsel in a civil case.'" *Id.* The Court finds that these comments did not constitute plain error.

■ Defendant additionally argues that Plaintiff's counsel's statement that he "wouldn't [be in plaintiff's situation for six months] for $5 million, I wouldn't do it for $10 million," was an improper "golden rule" argument.[16] The Court finds that although this statement may not have been proper in a closing, it was not a golden rule argument requiring reversal.

Finally, Defendant raises the following comments of Plaintiff's counsel:

> Let's face it, ladies and gentlemen, the reality of this country and the reality of this world is that power lies where the money is. People with money have power. Big corporations have power. .

---

14. The Order in Limine provided "[T]he motion is to prohibit mention that termination of Nick Porter had anything to do with the underlying facts of this case . . . Unless and until there is evidence admitted that would support such an inference, the motion is GRANTED."

15. THE COURT: Ladies and gentlemen of the jury, a comment was made, and I'm going to instruct you to please disregard it. There is no evidence whatsoever in this regard that Mr. Porter's being fired from Brink's had anything whatsoever directly or indirectly to do with this incident. And that implication is not correct, and it should be stricken from your consideration. It is stricken from the record, and you are to disregard that because there is no evidence at all to that effect. T. 7:89.

16. In a "golden rule" argument, counsel "encourages the jurors to put themselves in the shoes of the plaintiff and 'do unto him as they would have him do unto them' under similar circumstances." *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1540 n. 1 (11th Cir. 1989).

T. 7:22. Defendant did object to this statement. Because the Court finds that these comments were not pervasive enough to be "of a nature to impair calm and dispassionate consideration by the jury," and counsel advised the jury that it actually had the power in this case (T. 7:23), Defendant is not entitled to relief on this ground. *See Allstate Ins. Co. v. James,* 845 F.2d 315, 318 (11th Cir.1988).

### 3. Spoliation/Bad Faith

Defendant argues that the bad faith spoliation of evidence issue should not have been tried by the jury. Defendant cites to *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.,* 341 F.3d 1292, 1308 n. 16 (11th Cir.2003) for the proposition that "a spoliation claim cannot be tried at the same time as the underlying action." Mot. at 8. Defendant misreads the language of that decision and also misinterprets what procedurally occurred in this case. Although Judge Ungaro–Benages, in a pretrial ruling (reaffirmed by this Court upon motion for reconsideration after transfer) had allowed Plaintiff to pursue an independent claim for spoliation together with the malicious prosecution claim, Plaintiff ultimately chose not to try the spoliation claim in this case, and rather, the jury was instructed on the law of adverse inference, which was the appropriate procedure.

In *Green Leaf Nursery,* the Eleventh Circuit noted the Second District Court of Appeal of Florida has held that "a plaintiff cannot bring an independent spoliation claim where the alleged spoliator and the defendant in the underlying action are 'one and the same' because remedies exist in the context of the underlying suit." 341 F.3d at 1304 n. 16 (citing *Jost v. Lakeland*

*Regional Med. Ctr.,* 844 So.2d 656, 657–58, (Fla. 2d DCA 2003)); *see also Safeguard Management, Inc. v. Pinedo,* 865 So.2d 672 (Fla. 4th DCA 2004); *Martino v. Wal–Mart Stores,* 835 So.2d 1251, 1256 (Fla. 4th DCA 2003), *rev. granted,* 861 So.2d 430 (Dec. 16, 2003).[17]

The above referenced cases have held that an independent action is not appropriate, in that adverse inferences and presumptions can be drawn against the party who caused the loss. *See, e.g., Martino,* 835 So.2d at 1256. In *Amlan, Inc., v. Detroit Diesel Corp.,* 651 So.2d 701 (Fla. 4th DCA 1995), the court stated that in cases in which the destruction or unexplained disappearance of crucial evidence is alleged,

> an instruction may be given concerning the inference that the withheld or missing evidence would be unfavorable to the party failing to produce the evidence. . . . A jury may properly receive evidence and be instructed on the unexplained disappearance of evidence.

*Id.* at 703 (citations omitted); *see also Penalty Kick Management, Ltd. v. Coca Cola Co.,* 318 F.3d 1284, 1294 (11th Cir. 2003) (stating that "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."). This is exactly what occurred in the trial of this case.[18]

Defendant additionally objects to the instruction that was given to the jury. The Court accepted the Defendant's proposed instruction on this issue and therefore finds Defendant's argument to be without merit. R. 6: 154–55.

---

**17.** The Supreme Court of Florida has recently accepted certification of this issue based on conflict with *Bondu v. Gurvich,* 473 So.2d 1307 (Fla. 3d DCA 1984). It was the *Bondu* decision that this Court relied on, in part, in allowing the claims to be brought together.

**18.** To the extent Defendant argues that there was insufficient evidence for the issue to go to the jury in the first instance, the Court held a pretrial hearing on this issue and again rejects that argument.

#### 4. Contamination of Underlying Case

This argument is rejected based on the Court's denial with respect to the previous argument.

#### 5. Malicious Prosecution Jury Instruction

■■ At the charge conference, Defendant objected to the use of the words "or continued" in the malicious prosecution jury instruction wherein it is stated that the issues for the jury's determination are "whether the Defendant instituted or continued a criminal proceeding against the Plaintiff." Defendant argues that Plaintiff conceded that it was proceeding only on the theory that Brinks instituted the proceeding.

Although Plaintiff pled in the Amended Complaint that Brinks "maliciously commenced or continued an original criminal judicial proceeding" (Am.Cmplt.¶ 23), in the Revised/Updated Joint Pretrial Stipulation, the parties listed as "Issues of Fact Which Remain to be Litigated at Trial" the following, *inter alia:*

1. Whether there was an absence of probable cause for the original criminal proceeding?
2. Whether BRINK's instigated the original criminal proceeding?
3. Whether BRINK's acted with malice toward MARTINEZ in the original proceeding?

Notably, there is no mention of continuing a criminal proceeding.

The issue next arose at a conference with the Court during trial on September 25, 2003, when the following colloquy took place with respect to Defendant's desire to call state prosecutor Lanna Belohlavek:

MR. DAREN STABINSKI: When you're dealing with this cause of action for a malicious prosecution, you have to look at the investigation of the proceeding. She was not the filing attorney for the state attorney's office. She did not file the—Mr. Walsh agrees she was not the filing attorney and, therefore, her testimony is completely irrelevant. By the time she went to trial in this case, the investigation was done already and the damage was done already.

*So whether she continued the prosecution, by then it was too late. So her testimony is completely irrelevant.* If they had the filing attorney, then perhaps that may be used. But no such person was ever listed.

\* \* \* \* \* \*

THE COURT: Well, but Mr. Stabinski makes a point that—let's assume for the sake of argument that the case never went to trial, it was dismissed. If the Plaintiff can prove the proper elements, they've still got a malicious prosecution claim.

\* \* \* \* \* \*

THE COURT: The cause of action [has accrued] before this witness ever becomes a player.

MR. WALSH: If the cause of action accrued at arrest and initial filing, then what's [the] relevance of Jose Guilherme's testimony at the bond hearing a few days later?

THE COURT: Viewed in the light most favorable to the Plaintiff? Malice.

MR. WALSH: But malice after the fact. If it already accrued, any malice subsequently would have no relevance to malice at the time of the thing.

To cut to the chase, by the way, I think Mr. Stabinski knows this. It's not initiation of a prosecution; it's initiation—or I forget the exact word. But if you have the jury instructions—initiation or continuation. So—and they pled it that way and their jury instructions say initiation or continuation.

THE COURT: I still don't see that—all that those words mean is that if Plaintiff can't prove that the initiation of a prosecution was malicious, Plaintiff can succeed by proving the continuation of the prosecution is malicious.

*In this case—correct me if I'm wrong: I think I've heard enough evidence— Plaintiffs contend the initiation of the prosecution was malicious, And although I haven't heard anything verbal. I see a bunch of heads nodding up and down from the Plaintiff's table.*

MR. DAREN STABINSKI: *Yes, Your Honor.*

MR. WALSH: *Isn't Guilherme's testimony four days later a continuation theory?*

THE COURT: Plaintiff, you [have] got to deal with that. You can't have it both ways.

MR. DAREN STABINSKI: No, Your Honor.

MR. WALSH: That's been the centerpiece.

MR. DAREN STABINSKI: *Well, first of all, Your Honor, the bond hearing testimony is impeachment and a statement against a party opponent, because Mr. Guilherme said he didn't see anything on the tapes, and in the bond hearing he says that my client was on that tape stealing the money, So that's first of all.*

*And, second of all, you're talking about four days versus the trial that occurs six months later. And it also goes to damages, because if [sic] my client had to spend the six months in jail because of Mr. Guilherme's improper testimony at the bond hearing, because he couldn't get his bond reduced.*

THE COURT: Okay.

T.2:207–08. At the charging conference held on October 1, 2003, the following took place:

MR. WALSH: On paragraph two, the first line, it says one acts without probable cause in instituting or continuing. I think the Plaintiffs affirmed to this Court that they weren't going on a continuing theory, that they were disregarding that theory and going strictly on an instituting theory and, therefore, that should be deleted, it should just be "instituting" throughout the instructions.

\* \* \* \* \* \*

MR. DAREN STABINSKI: Your Honor, everything here is after the point that Mr. Romano calls the police, everything's continuing. Everything that happened after that is continuing. Continuing is a part of this case, and we've pled it in our complaint.

MR. WALSH: I asked the Court the other day about the relevance of I think the bond hearing or something, and I pointed out to—maybe it comes in as a continuing theory—and you looked at the whole table and said, well, you guys aren't going on that theory anyway; you're going on an instigating theory, aren't you? And they all stood up and said, yeah, we're not arguing a continuation of a malicious prosecution, we're arguing institution of a criminal

\* \* \* \* \* \*

MR. DAREN STABINSKI: I never said anything. There was a discussion, and Mr. Walsh is the one that brought up that there's evidence in the record about continuing, and you did come up at that point to us and said, well, isn't the—I think it had something to do with the—allegations about that they've made so far have to do with instigating and we agree with that. But at no point did we say, Judge, we're dropping our continuing action.

T. 6:137–39. Based on this discussion, the Court gave the jury instruction with the "continuation" language included.

This Court agrees with Defendant that in the exchange on September 5, 2003, in arguing that Ms. Belohlavek's testimony was irrelevant, Plaintiff's counsel indicated that Plaintiff was not pursuing a continuing theory. The Court therefore finds that the instruction which included the continuation language was improper, and Defendant is therefore entitled to a new trial.

### 6. Evidentiary Rulings

Defendant argues that the Court made several incorrect rulings on the admission or exclusion of evidence. The Court has reviewed these evidentiary rulings and finds that no error occurred, but even if it had, any error, even considered cumulatively, was not so harmful as to warrant a new trial.

### 7. Punitive Damages Instruction

■■■ The Court rejects Defendant's argument that the Court incorrectly instructed the jury as to corporate liability for punitive damages. In *Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla.1995), the Supreme Court of Florida determined that the instruction given by this Court is proper when the wrongful intentional conduct is committed by an officer, agent or employee who "is a managing agent or holds a policy-making position." *Id.* at 1161. This Court reiterates its previous determination that Guilherme and Romano qualified as "managing agents" for purposes of corporate liability for punitive damages. As Plaintiff notes, both of these managers had the power to make the rele-

vant decisions in the case without consulting any other Brinks management.[19]

### III. *Motion for Remittitur*

### 1. Lost Earnings

The Court initially rejects Defendant's argument that Plaintiff should have been precluded from obtaining lost future earnings because the first time Defendant became aware of the amount of damages Plaintiff was seeking was during Plaintiff's closing argument, in that Defendant failed to make any contemporaneous objection.

As to Defendant's argument that Plaintiff's evidence was insufficient as a matter of law to support the award of damages for lost earnings due to lack of expert testimony, Defendant failed to move for directed verdict on any damage issue. Accordingly, the issue cannot now be raised. *See Rankin v. Evans*, 133 F.3d 1425, 1431 (11th Cir.1998); *House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.*, 468 F.2d 64, 68 (5th Cir.1972).

### 2. Punitive Damages Award/Intangible Damages

■■■ Defendant additionally moves for a new trial or a remittitur as to the amount of damages. Where a federal court finds that a jury's award is excessive, it may grant a motion for new trial. *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1328 n. 8 (11th Cir.1999). In a diversity case, the court looks to state substantive law to determine whether the verdict is excessive. *See Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1446 (11th Cir.1991). A verdict is excessive under Florida law where "it is so inordinately

---

**19.** Defendant cites Guilherme's testimony in which he answered "no" when asked whether he "makes the determination to arrest an individual, whether it's an employee of Brink's or not." T. 2:28. This response is not dispositive, in that, as Guilherme properly noted, the police make that determination. As the manager of the West Palm Beach branch, however, Guilherme certainly had management authority over the investigation of his employee.

large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould v. Touchette,* 349 So.2d 1181, 1185 (Fla.1977).

 "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003) (citing Restatement (Second) of Torts § 903, pp. 453–54 (1979)). "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.,* 538 U.S. 408, 123 S.Ct. at 1521. The Court has already determined that there was insufficient evidence of malice to support an award of punitive damages. Moreover, this Court finds that even if punitive damages were justified, the award was grossly excessive, as was the $1,260,000 award for lost wages and the $3,000,000 award for intangible damages, based on the evidence presented to the jury.

 As to the lost wages award, the figures advanced by Plaintiff's counsel assumed that Plaintiff would be unable to find work, and there was insufficient evidence for the jury to come to this conclusion. Moreover, even under Plaintiff's counsel's method of determining lost wages, present and future, Plaintiff would have earned $644,800, as counsel argued in closing. The jury awarded Plaintiff almost twice that amount, which this Court finds to be grossly excessive. Moreover, the fact that an independent state prosecutor found probable cause to prosecute Plaintiff renders a verdict of $4,000,000 in punitive damages based on "malice" on the part of Brinks unwarranted.

 "[A] grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice and thus necessitate a new trial." *Goldstein v. Manhattan Industries., Inc.,* 758 F.2d 1435, 1447 (11th Cir.1985). However, "a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court." *Id.*[20] Considering the amounts awarded for lost wages, intangible damages and punitive damages, this Court finds the verdict in this case to be so high that it "shocks the judicial conscience," and further believes, for the reason discussed in Section IV below, that the verdict was the result of passion and prejudice. Accordingly, the Court finds that Defendant is entitled to a new trial as to damages.

### IV. Supplemental Motion for New Trial[21]

During voir dire juror Ana Veciana–Suarez failed to disclose material information, necessitating a new trial in this case. Ms. Veciana–Suarez did not raise her hand on two occasions when asked whether any family members or friends even spent any time in jail. (T. 1:26, 45). She also did not raise her hand when she was asked the "catch-all" question "Is there anything that you feel that we ought to know in terms of trying to determine fair and impartial jurors?" (T. 1:42). The Court additionally asked whether any of the jurors "or your friends or family, ever [have] been what

---

**20.** Alternatively, a motion for remittitur can be granted where the Court believes the jury's award is unreasonable on the facts. *Johansen,* 170 F.3d at 1331.

**21.** The Court reiterates its rejection of Plaintiff's argument that Defendant has not satisfied the timeliness requirement as to this issue, as further supported by Defendant's Supplement filed April 12, 2004 and accompanying affidavits.

you think is wrongfully accused of a crime," and no jurors responded. (T. 1:26). Brink's counsel asked a similar question and no jurors responded. (T. 1: 68).

After Plaintiff's trial was concluded the undersigned Magistrate Judge, purely by coincidence, obtained information that Ms. Veciana–Suarez's father, Antonio Veciana, may have been convicted of federal drug charges and served a federal prison sentence. Investigation by the Court into court records revealed that Mr. Veciana indeed had been convicted in 1974 and that Ms. Veciana–Suarez was aware of the conviction. The Court advised the parties and held a hearing on this matter, during which Ms. Veciana–Suarez was questioned by counsel and the Court.[22]

At the hearing before this Court, Ms. Veciana–Suarez invoked her Fifth Amendment privilege when asked why she did not raise her hand when the questions discussed above were asked. She also refused to answer the following questions, *inter alia:*

Do you feel that your father was innocent of the charges for which he was convicted?

Was your father, indeed, convicted of charges?

What type of an impact has this, your father's conviction, had on your life?

What type of an impact is [sic] your father's conviction and sentence had on the lives of those closest to you, your siblings and other close family members?

Do you believe your father was wrongfully accused and arrested?

Do you believe your father received a fair trial?

Do you believe that anyone testified falsely during your father's trial?

Do you believe any false testimony played a role in your father's conviction?

Have you ever written anything or spoken publicly about your father's conviction and imprisonment?

Have you ever talked with your father about his guilt or innocence?

Are you aware of your father's statements that he was the victim of a politically motivated prosecution?

Has your father ever told you that he was arrested and prosecuted as a warning sent from the U.S. Government to him to keep his mouth shut and desist from scheming against Fidel Castro?

Has your father ever told you or do you believe that the regime of Fidel Castro somehow was influential of [sic] your father's arrest and prosecution?

In *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the Court held that, "to obtain a new trial [when a juror fails to answer question during voir dire], a party must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 104 S.Ct. 845. This decision is subject to the discretion of the Court. *Id.; see also United States v. Carpa,* 271 F.3d 962 (11th Cir.2001).

The case of *United States v. Perkins,* 748 F.2d 1519 (11th Cir.1984) is somewhat

---

**22.** Additional investigation into this matter revealed that the juror's father was a Cuban national who had organized a plot in 1961 to assassinate Fidel Castro and escaped from Cuba when the plot was discovered. Upon returning to Miami, he founded Alpha 66, a large anti-Castro organization. In 1973, Ve-

ciana was indicted on a charge of conspiracy to distribute and possess with intent to distribute cocaine, and was convicted. Veciana later attributed his prosecution to the CIA and/or Castro. Gaeton Fonzi, *The Last Investigation,* pp. 145, 395.

factually analogous to the case at bar. In that case, a juror failed to disclose during voir dire that he knew the defendant and that he had previously been involved in a civil suit. *Id.* at 1529–31. The trial judge held a post-trial hearing in which the juror was re-questioned. *Id.* at 1530. Despite the fact that the juror's answers were inconsistent with voir dire answers and the other evidence presented, the trial court denied the motion for a new trial. *Id.* at 1531. On appeal, the Eleventh Circuit applied the two part *McDonough* test and reversed. *Id.* at 1531–33. In the instant case, the juror failed to disclose pertinent information; however, unlike *Perkins,* the juror invoked her Fifth Amendment privilege during the post-trial hearing. Thus the pertinent question becomes whether the juror's invocation of her Fifth Amendment privilege affects the application of the *McDonough* test.

The first part of the test requires a determination of whether the juror failed to answer truthfully question(s) posed during voir dire. The court in *Perkins* interprets this to mean whether the juror was aware that her answers were false. *Id.* at 1531. Here, since the juror remained silent during the post-trial hearing when the Court attempted to make this determination, an adverse inference may be drawn. *See Baxter v. Palmigiano,* 425 U.S. 308, 318–19, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *see also Pyles v. Johnson,* 136 F.3d 986, 997 (5th Cir.1998) (finding that the Fifth Amendment does not forbid adverse inferences against a non-party witness in a civil action; however, this does not mean that an adverse inference is required); *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) (stating that "[s]ilence gains more probative weight where it persists in the face of accusation, ... failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question."). Thus the Court may draw the adverse inference that Ms. Veciana–Suarez was aware of and purposefully withheld answers to voir dire questions.

The second part of the *McDonough* test requires a determination of whether the juror's answer(s) would have provided a valid basis for a challenge for cause; that is, whether the juror's answer(s) would have demonstrated her bias. *See Perkins,* 748 F.2d at 1532. Actual bias may be shown "either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias may be presumed." *Carpa,* 271 at 967; *see also McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (noting that the dishonesty of a juror is the best initial indicator of whether the juror was biased) (J. Blackmun, concurring). Here, in taking into account the juror's non-disclosure of material facts during voir dire and her subsequent invocation of her Fifth Amendment privilege, the Court may presume (adversely infer) her to have been biased. The Court rejects Plaintiff's argument that this adverse inference against a witness (here a juror) cannot be "imputed" to a party (i.e. Plaintiff), based on the fact that here, the juror's bias goes to the heart of the case, that is, the reliability of the verdict. Even if Plaintiff's position is correct, the adverse inference may still be applied to the juror, resulting in the same conclusion.

Plaintiff argues that Defendant is precluded from moving for a new trial based on the facts surrounding juror Veciana–Suarez because it did not challenge any of the other jurors who indicated that they or their family members had spent any time in jail. The Court finds that the circumstances surrounding those jurors differ significantly from the facts which presumably would have been disclosed had Ms.

Veciana–Suarez revealed her father's conviction and its effect on her. As to Plaintiff's argument that defense counsel did not make further inquiry on this matter with respect to the other jurors, the Court finds that there was no reason for counsel to do so, in light of the fact that Plaintiff's counsel asked most of the individually responding jurors whether there was anything from the experience that would make the juror favor one side or the other or have "ill feelings," and the jurors answered in the negative.[23] Additionally, defense counsel did ask all of the jurors if any had "ever felt that a family member ..., a brother, sister, father, mother, first cousin, has ever been wrongfully accused[ ]" of "anything, a crime, a theft, anything like that," and all of the jurors, including Ms. Veciana–Suarez, remained silent. T: 1:68.

Based on the responses given by Ms. Veciana–Suarez at the hearing, and the permissible inferences that may be drawn therefrom, the Court finds that juror Veciana–Suarez failed to answer honestly material questions, and further finds that a truthful response to those questions would have provided a valid basis for a challenge for cause. Accordingly, Defendant is entitled to a new trial.

### V. Conclusion

The Court being otherwise fully advised in the premises it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Judgment as a Matter of Law is hereby **GRANTED**.

2. Alternatively, Defendant's Defendant's Motion for New Trial is hereby **GRANTED** on the issues of improper jury instruction and excessive damages and **DENIED** in all other respects;

3. Defendant's Supplemental Motion for New Trial is hereby **GRANTED**; and

4. Defendant's Motion for Remittitur is hereby **DENIED** as moot.

---

**23.** T. 1:45 (Alvarez); T. 1:46 (Zamudio); T. 1:46 (Wurzbach); T. 1:47 (Castellano).